United States District Court

For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CHANEL, INC.

        Plaintiff,

  v.

CASONDRA TSHIMANGA, *et al.*,

        Defendants.

_____/

No. C-07-3592 EMC

**REPORT AND RECOMMENDATION RE PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT**

**(Docket No. 18)**

     Plaintiff Chanel, Inc. has filed suit against Defendant Casondra Tshimanga for violations of the Lanham Act.  After Ms. Tshimanga failed to respond to the complaint, default was entered on February 21, 2008.  *See* Docket No. 16.  Chanel thereafter moved for default judgment.  Having considered Chanel's motion for default judgment, the supplemental briefing and evidence thereafter provided by Chanel, and all other evidence of record, the Court hereby recommends that the motion be **GRANTED**.

## I.   <u>FACTUAL & PROCEDURAL BACKGROUND</u>

A.   <u>Complaint</u>

     In its complaint, Chanel alleges as follows.  Chanel is the owner of nine federally registered trademarks.  *See* Compl. ¶ 10.  The marks are used in connection with the manufacture and distribution of, *inter alia*, handbags, wallets, and scarves.  *See id.* ¶ 10.  Through three websites -- HandBayOutpost.com, DesignerOutpost.net, and HandbagsLuxery.com -- Ms. Tshimanga has promoted, advertised, distributed, sold, and/or offered for sale counterfeit products, including at least handbags and wallets, bearing marks which are exact copies of Chanel's marks.  *See id.* ¶¶ 2, 19.

United States District Court

For the Northern District of California

1  The counterfeit goods are of a quality substantially different from Chanel's genuine goods.  *See id.* ¶

2  20.  Ms. Tshimanga's use of the Chanel marks has been without Chanel's consent or authorization.

3  *See id.* ¶ 23.

4      Based on the above allegations, Chanel has asserted claims for (1) trademark counterfeiting

5  and infringement, *see* 15 U.S.C. § 1114; (2) false designation of origin in violation of the Act, *see id.*

6  § 1125(a); and (3) trademark dilution.  *See id.* § 1125(c).

7  B.    Motion for Default Judgment

8      In its motion for default judgment, Chanel provides evidence to support the claims asserted

9  in the complaint.  Most notably, Chanel provides evidence regarding its nine trademarks and further

10  provides evidence supporting its contention that Ms. Tshimanga is the owner of the three websites at

11  issue, *i.e.*, HandbagOutpost.com, DesignerOutpost.net, and HandbagsLuxery.com.  Chanel also

12  provides evidence supporting its claim for statutory damages.

13      1.    Nine Trademarks

14      Based on the evidence provided by Chanel, five of the trademarks consist of a CC monogram

15  and four of the trademarks consist of simply the word "Chanel."  *See* Mot., Ex. D; *see also* Compl. ¶

16  10.

17      With respect to the CC monogram trademarks, two of the trademarks consist of black CC

18  monograms used for leather goods such as handbags and wallets.  *See* Mot., Ex. D (Reg. No.

19  1,734,822 and Reg. No. 1,314,511).  Chanel concedes that these two trademarks cover the same

20  marks for similar goods.  *See* Docket No. 25 (Pl.'s Supp. Br. at 4).  The remaining CC monogram

21  trademarks consist of a three-quarter black CC monogram used for handbags, *see* Mot., Ex. D (Reg.

22  No. 3,025,934); a black CC monogram in a box used for, *e.g.*, handbags and scarves, *see* Mot., Ex.

23  D (Reg. No. 3,022,708); and a white CC monogram used for, *e.g.*, scarves.  *See* Mot., Ex. D (Reg.

24  No. 1,501,898).

25      With respect to the Chanel word trademarks, three of the trademarks are used for handbags

26  and/or other leather goods such as wallets.  *See* Mot., Ex. D (Reg. No. 626,035; Reg. No. 1,347,677;

27  and Reg. No. 1,733,051).  Chanel concedes that these three trademarks are overlapping.  *See* Docket

28

2

1   No. 25 (Pl.'s Supp. Br. at 4).  The remaining Chanel word trademark is used for, *e.g.*, coats and

2   scarves.  *See* Mot., Ex. D (Reg. No. 906,262).

3        2.     <u>Websites</u>

4        Chanel provides the following evidence to support its contention that Ms. Tshimanga is the

5   owner of the three websites at issue, each of which sold or offered for sale the counterfeit Chanel

6   products.

7        a.     <u>HandbagOutpost.com</u>

8        The domain name HandbagOutpost.com was created on April 10, 2006.  *See* Docket No. 38

9   (Pl.'s 2d Supp. Br., Ex. A) (transaction report); Mot., Ex. E (Robert Holmes Decl. ¶ 4 & Ex. 1)

10  (WHOIS search results).  Ms. Tshimanga appears to be the original domain registrant.  She

11  registered using the mailing address 2642 Oliver Drive, Hayward, California 94545 and the email

12  address ebook555@comcast.net.  *See* Docket No. 38 (Pl.'s 2d Supp. Br., Ex. A) (transaction report).

13  Through investigation, Chanel has located independent evidence that also connects Ms. Tshimanga

14  to the email address ebook555@comcast.net.  *See* Docket No. 38 (Pl.'s 2d Supp. Br., Ex. E) (3d

15  Robert Holmes Decl. ¶ 6 & Ex. 1) (stating that the email address "is attached to a Linkedin.com

16  profile for Casondra Tshimanga, who is identified as the owner of Baggs All Inc., an import and

17  export specialist in the San Francisco Bay Area").

18       In or about May 2006, Chanel retained IPCyberCrime.com, LLC (formerly, the Holmes

19  Detective Agency) to investigate the sale of counterfeit products by Ms. Tshimanga.  *See* Mot., Ex.

20  C (Hahn Sisbarro Decl. ¶ 10); Mot., Ex. B (Jason Holmes Decl. ¶ 3); Mot., Ex. E (Robert Holmes

21  Decl. ¶ 3); Mot., Ex. F (Oka Decl. ¶ 5).

22       On or about May 3, 2006, Robert Holmes of IPCyberCrime.com conducted a domain name

23  search of HandbagOutpost.com.  On that date, Ms. Tshimanga was listed as the registrant as well as

24  the administrative contact and technical contact.  *See* Mot., Ex. E (Robert Holmes Decl. ¶ 4 & Ex. 1)

25  (WHOIS search results).

26       On or about May 26, 2006, Mr. Holmes ordered a handbag bearing a Chanel mark from

27  HandbagOutpost.com.  *See* Mot., Ex. E (Robert Holmes Decl. ¶ 5).  Mr. Holmes paid for the

28  handbag by a debit/credit card; the payee information provided was "BAY ELECTRONICS 510-

1   938-8438 CA US." Mot., Ex. E (Robert Holmes Decl. ¶ 6).  Mr. Holmes received a telephone call

2   from the payee telephone number 510-938-8438.  The caller identification feature on Mr. Holmes's

3   telephone listed the caller as "Tshimanga Cason."  Mot., Ex. E (Robert Holmes Decl. ¶ 15).

4   Through investigation, Mr. Holmes independently confirmed that Ms. Tshimanga was the account

5   holder for the payee telephone number 510-938-8438.  *See* Docket No. 38 (Pl.'s 2d Supp. Br., Ex. E)

6   (3d Robert Holmes Decl. ¶ 5).

7           On June 20, 2006, Mr. Holmes received the handbag he had purchased through UPS.  The

8   return address was listed as: "Handbag Outpost, (800) 431-1365, HandbagOutpost, 2642 Oliver Dr.,

9   Hayward CA 94545."  Mot., Ex. E (Robert Holmes Decl. ¶ 7 & Ex. 2) (return address).  Through

10  investigation, Mr. Holmes independently confirmed that this address was Ms. Tshimanga's home

11  address.  *See* Docket No. 38 (Pl.'s 2d Supp. Br., Ex. E) (3d Robert Holmes Decl. ¶ 4).  As noted

12  above, this address was also used by Ms. Tshimanga in registering the domain name

13  HandbagOutpost.com.

14          Chanel had the handbag that Mr. Holmes purchased examined and the bag was determined to

15  be a nongenuine Chanel product.  *See* Mot., Ex. C (Hahn Sisbarro Decl. ¶ 11).  Chanel also

16  determined that the product was inferior workmanship and materials.  *See id.*

17          As of October 2, 2006, Ms. Tshimanga continued to be listed as the domain registrant for

18  HandbagOutpost.com.  *See* Docket No. 25 (Pl.'s Supp. Br., Ex. A) (2d Robert Holmes Decl., Ex. 2)

19  (WHOIS search results).

20          Furthermore, from April 3, 2007, to March 17, 2008, it appears that Ms. Tshimanga

21  continued to be the domain registrant for HandbagOutpost.com.  Documents produced by Network

22  Solutions, Inc. pertaining to the registration account for HandbagOutpost.com establish as follows.

23  •       On April 3, 2007, there was activity on the registration account for HandbagOutpost.com

24          conducted by Casondra Stall.  It is more than likely that Casondra Stall was an alias for Ms.

25          Tshimanga in light of (1) the shared first name (*i.e.*, Casondra) and (2) the shared email

26          address (*i.e.*, ebook555@comcast.net).  *See* Docket No. 38 (Pl.'s 2d Supp. Br., Ex. A)

27          (transaction report).

28

**United States District Court**
For the Northern District of California

1  •      On July 27, 2007, there was activity on the registration account for HandbagOutpost.com

2        conducted by More Bags, Inc.  It is more than likely that More Bags was a "dba" for Ms.

3        Tshimanga in light of (1) the shared mailing address (*i.e.*, 2642 Oliver Drive) and (2) the

4        shared email address (*i.e.*, ebook555@comcast.net).  *See* Docket No. 38 (Pl.'s 2d Supp. Br.,

5        Ex. A) (transaction report).

6  •      On March 15, 2008, there was activity on the registration account for HandbagOutpost.com

7        conducted by Handbag Outpost.  It is more than likely that Handbag Outpost was a "dba" for

8        Ms. Tshimanga because the credit card that was used to conduct the transaction was the same

9        as that used by More Bags (*i.e.*, account number ending in 4429).  *See* Docket No. 38 (Pl.'s

10       2d Supp. Br., Ex. A) (transaction report).

11      Finally, it appears that, as of June 12, 2008, *see* Docket No. 38 (Pl.'s 2d Supp. Br., Ex. D)

12 (Sterling Aff.) (dated June 12, 2008), Ms. Tshimanga continued to be the domain registrant for

13 HandbagOutpost.com.  Documents produced by Network Solutions, Inc. pertaining to the

14 registration account for HandbagOutpost.com indicate that, even though the registrant for the

15 website has provided a mailing address in Panama and identifies the primary user as Justine Bliazze,

16 the registrant's email address is still listed as ebook555@comcast.net, *i.e.*, Ms. Tshimanga's email

17 address.

18         b.     DesignerOutpost.net

19      The domain name DesignerOutpost.net was created on June 1, 2006.  *See* Docket No. 38

20 (Pl.'s 2d Supp. Br., Ex. B) (transaction report); Mot., Ex. E (Robert Holmes Decl. ¶ 9 & Ex. 3)

21 (WHOIS search results).  Ms. Tshimanga appears to have the original domain registrant.  She

22 registered using the mailing address 2642 Oliver Drive, Hayward, California 94545 and the email

23 address ebook555@comcast.net.  *See* Docket No. 38 (Pl.'s 2d Supp. Br., Ex. B) (transaction report).

24      On or about July 2006, Chanel retained IPCyberCrime.com to investigate the website

25 DesignerOutpost.net.  *See* Mot., Ex. E (Robert Holmes Decl. ¶ 9).

26      On July 11, 2006, Mr. Holmes conducted a domain name search of DesignerOutpost.net.

27 Ms. Tshimanga was listed as the registrant as well as the administrative contact and technical

28 contact.  *See* Mot., Ex. E (Robert Holmes Decl. ¶ 9 & Ex. 3) (WHOIS search results).

**United States District Court**

For the Northern District of California

1    As of October 2, 2006, Ms. Tshimanga continued to be listed as the domain registrant for

2    DesignerOutpost.net.  *See* Docket No. 25 (Pl.'s Supp. Br., Ex. A) (2d Robert Holmes Decl., Ex. 2)

3    (WHOIS search results)

4    By October 30, 2006, however, Kelly Watson was listed as the domain registrant.  *See*

5    Docket No. 25 (Pl.'s Supp. Br., Ex. A) (2d Robert Holmes Decl. ¶ 7 & Ex. 4) (WHOIS search

6    results).  In October 2007, the domain registrant was listed as Handbag Outpost.  *See*  Docket No. 25

7    (Pl.'s Supp. Br., Ex. A) (2d Robert Holmes Decl. ¶ 8 & Ex. 5) (WHOIS search results).  At that

8    time, the email address for Handbag Outpost was listed as ebook555@comcast.net and the mailing

9    address as 39270 Paseo Padre Parkway, Suite 325, Fremont, California 94536.  *See* Docket No. 25

10   (Pl.'s Supp. Br., Ex. A) (2d Robert Holmes Decl., Ex 5).

11   In spite of the change in registrant name to Kelly Watson and Handbag Outpost, it appears

12   that Ms. Tshimanga continued to be the true registrant of DesignerOutpost.net, at least through

13   October 2007.  For example, it is more than likely that Handbag Outpost was actually a "dba" for

14   Ms. Tshimanga because of the shared email address (*i.e.*, ebook555@comcast.net).  Also, the

15   mailing address provided -- *i.e.*, 39270 Paseo Padre Parkway, Suite 325, Fremont, California 94536 -

16   - was used by Ms. Tshimanga in April 2007 (using the alias Casondra Stall) in conjunction with

17   HandbagOutpost.com.  *See* Docket No. 38 (Pl.s' 2d Supp. Br., Ex. A) (transaction report).

18          c.     HandbagsLuxery.com

19   The domain name HandbagsLuxery was created on December 10, 2006.  *See* Docket No. 38

20   (Pl.'s 2d Supp. Br., Ex. C) (transaction report); Mot., Ex. E (Robert Holmes Decl. ¶ 11 & Ex. 4)

21   (WHOIS search results).  Casondra Satcher appears to have been the original domain registrant.  It is

22   more than likely that Casondra Satcher was an alias for Ms. Tshimanga as Casondra Satcher

23   registered using the mailing address 2642 Oliver Drive, Hayward, California 94545 and the email

24   address ebook555@comcast.net.  *See* Docket No. 38 (Pl.'s 2d Supp. Br., Ex. C) (transaction report).

25   In or about January 2007, Chanel retained IPCyberCrime.com to investigate the website

26   HandbagsLuxery.com.  *See* Mot., Ex. E (Robert Holmes Decl. ¶ 10).

27

28

On January 9, 2007, Mr. Holmes conducted a domain name search of HandbagsLuxery.com. Kelly Watson was listed as the registrant, administrative contact, and technical contact. *See* Mot., Ex. E (Robert Holmes Decl. ¶ 11 & Ex. 4) (WHOIS search results).

In spite of the registrant name (*i.e.*, Kelly Watson), it appears that Ms. Tshimanga was the true registrant of HandbagsLuxery.com, at least as of November 29, 2007. Documents produced by Network Solutions, Inc. pertaining to the registration account for HandbagsLuxery.com reflect that, on that date, there was activity on the registration account for HandbagsLuxery.com conducted by More Bags. It is more than likely that More Bags was a "dba" for Ms. Tshimanga because the credit card that was used to conduct the transaction was the same as that used by More Bags in conjunction with activity on the HandbagOutpost.com registration account (*i.e.*, account number ending in 4429). *See* Docket No. 38 (Pl.'s 2d Supp. Br., Ex. C) (transaction report).

On January 5, 2008, the domain registrant of HandbagsLuxery.com was listed as Handbag Outpost. *See* Docket No. 25 (Pl.'s Supp. Br., Ex. A) (2d Robert Holmes Decl. ¶ 10 & Ex. 7) (WHOIS search results); *see also* Mot., Ex. E (Robert Holmes Decl. ¶ 15) (noting that, in early 2007, HandbagsLuxery.com had the same fax number as HandbagOutpost.com). As discussed above, it is more than likely that Handbag Outpost was a "dba" for Ms. Tshimanga.

3.     Chanel's Communication with Ms. Tshimanga

In November 2006, Chanel sent a cease-and-desist letter addressed to Ms. Tshimanga. *See* Mot., Ex. F (Oka Decl. ¶ 7 & Ex. 1) (letter). The letter was sent by electronic mail to info@handbagoutpost.com and customerservice@handbagoutpost.com and also by certified mail to 2642 Oliver Drive, Hayward, California 94545 (which, as indicated above, Mr. Holmes determined was Ms. Tshimanga's home address). *See* Mot., Ex. F (Oka Decl., Ex. 1) (email and letter). In the letter, Chanel asserted that Ms. Tshimanga was violating Chanel's trademark rights through her sales of counterfeit products through HandbagOutpost.com and DesignerOutpost.net. *See* Mot., Ex. F (Oka Decl., Ex. 1).

On November 13, 2006, Chanel received an email response from customerservice@handbagoutpost.com. The email stated: "I need a phone number where I can reach you." Mot., Ex. F (Oka Decl., Ex. 2) (email). The email did not dispute that the recipient of

**United States District Court**
For the Northern District of California

1    the letter from Chanel was Ms. Tshimanga.  Chanel responded to the email but apparently did not

2    hear receive any further response.

3        Subsequently, the website HandbagsLuxery.com was created and counterfeit Chanel goods

4    were advertised and offered for sale there.

## II.    DISCUSSION

A.    Adequacy of Service

7        To grant or deny a default judgment, a court must first "assess the adequacy of the service of

8    process on the party against whom default is requested."  *Board of Trustees of the N. Cal. Sheet

9    Metal Workers v. Peters*, No. C-00-0395 VRW, 2000 U.S. Dist. LEXIS 19065, at *2 (N.D. Cal. Jan.

10   2, 2001).  Under Federal Rule of Civil Procedure 4(e), an individual may be served with a copy of

11   the summons and complaint by personal delivery.  *See* Fed. R. Civ. P. 4(e)(2).  In the instant case,

12   Chanel has provided a declaration from a process server which states, under penalty of perjury, that

13   Ms. Tshimanga was personally served on October 27, 2007.  *See* Docket No. 7.  Accordingly, the

14   Court concludes that service of process was proper.

B.    Merits of Motion for Default Judgment

16       After entry of a default, a court may grant a default judgment on the merits of the case.  *See

17   Fed. R. Civ. P. 55.  A default judgment may not be entered, however, against an infant or

18   incompetent person unless represented in the action by a general guardian or other such

19   representative who has appeared.  *See id.*  Furthermore, a default judgment may not be entered

20   against an individual in military service until after the court appoints an attorney to represent the

21   defendant.  *See* 50 U.S.C. App. § 521.  In the instant case, Chanel has provided sufficient evidence

22   demonstrating that Ms. Tshimanga is neither an infant, incompetent person, or a person in military

23   service.  *See* Mot., Ex. A (Keller Decl. ¶ 5); Mot., Ex. E (Holmes Decl. ¶ 4).  Accordingly, the Court

24   may consider whether a default judgment may be entered against Ms. Tshimanga.

25       After entry of a default, a court may grant a default judgment on the merits of the case.  *See

26   Fed. R. Civ. P. 55.  "The district court's decision whether to enter a default judgment is a

27   discretionary one."  *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).  Factors that a court may

28   consider in exercising that discretion include:

**United States District Court**
For the Northern District of California

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986). The general rule is that, upon entry of default, the well-pleaded allegations of the complaint relating to a defendant's liability are taken as true, with the exception of the allegations as to the amount of damages. *See TeleVideo System, Inc. v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987).

The majority of the above factors weigh in favor of default judgment. For example, if the motion for default judgment were to be denied, then Chanel would likely be left without a remedy. *See Walters v. Shaw/Guehnemann Corp.*, No. C 03-04058 WHA, 2004 U.S. Dist. LEXIS 11992, at *7 (N.D. Cal. Apr. 15, 2004) ("To deny plaintiffs' motion [for default judgment] would leave them without a remedy. Prejudice is also likely in light of the merits of their claim."); *Pepsico, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002) ("If Plaintiffs' motion for default judgment is not granted, Plaintiffs will likely be without other recourse for recovery."). Notably, Chanel sent a cease-and-desist letter to Ms. Tshimanga in November 2006 but to no avail. In fact, after the letter was sent, Ms. Tshimanga set up a new website, HandbagsLuxery.com, and offered counterfeit products for sale there. *See* Docket No. 25 (Pl.'s Supp. Br., Ex. B at 44). Also, the sum of money at stake in the action is appropriate -- statutory damages are expressly provided for in 15 U.S.C. § 1117(c) when counterfeit marks are used.[1] *See id.* at 1176 (stating that "the court must consider the amount of money at stake in relation to the seriousness of Defendant's conduct"). Finally, because Ms. Tshimanga has not filed an answer to the complaint, there is little to suggest that there is a possibility of a dispute concerning material facts, and it is unlikely that her default was due to excusable neglect, especially when Chanel served not only the summons and complaint but also the motion for default judgment on Ms. Tshimanga, *see* Docket Nos. 7, 19, but still received no response.

---

[1] The Court, however, does disagree with Chanel as to the appropriate amount of statutory damages. *See* Part II.C.2, *infra*.

**United States District Court**

For the Northern District of California

The only factors that deserve closer analysis are the second and third factors, which essentially require that "a plaintiff 'state a claim on which [it] may recover.'" *Pepsico*, 238 F. Supp. 2d at 1175. As noted above, in its complaint, Chanel has asserted claims for (1) trademark counterfeiting and infringement, *see* 15 U.S.C. § 1114; (2) false designation of origin in violation of the Act, *see id.* § 1125(a); and (3) trademark dilution. *See id.* § 1125(c). Because Chanel seeks statutory damages as relief in its motion for default judgment, and because statutory damages are available as relief only for the use of counterfeit marks, *see id.* § 1117(c), the Court shall focus on only the first claim only -- *i.e.*, whether Chanel has properly stated a claim for relief for trademark counterfeiting and infringement. *See also* Mot. at 17 (focusing on the first claim).

The Lanham Act provides in relevant part as follows:

> (1)    Any person who shall, without the consent of the [trademark] registrant --
>
>    (a)    use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . .
>
> . . . .
>
> shall be held liable in a civil action by the registrant for the remedies hereinafter provided. . . .

*Id.* § 1114(1)(a). As reflected by the language above, to succeed on a claim for trademark infringement, a plaintiff must establish the following: (1) ownership of the trademark at issue; (2) use by the defendant, without authorization, of a copy, reproduction, counterfeit or colorable imitation of the moving party's mark in connection with the sale, distribution or advertising of goods or services; and (3) that defendant's use of the mark is likely to cause confusion, or to cause mistake or to deceive. *See Mytee Prods. v. H.D. Prods.*, No. 05CV2286 R (CAB), 2006 U.S. Dist. LEXIS 96385, at *3 (S.D. Cal. June 22, 2006). "'An eight-factor test -- the so-called *Sleekcraft* factors -- guides the assessment of whether a likelihood of confusion exists.'" *Perfumebay.com Inc. v. eBay Inc.*, 506 F.3d 1165, 1173 (9th Cir. 2007). Those factors are as follows: (1) the strength of the mark; (2) proximity or relatedness of the goods; (3) the similarity of the marks; (4) evidence of actual

**United States District Court**

For the Northern District of California

confusion; (5) the marketing channels used; (6) the degree of care customers are likely to exercise in purchasing the goods; (7) the defendant's intent in selecting the mark; and (8) the likelihood of expansion into other markets. "'The test is a fluid one and the plaintiff need not satisfy every factor, provided that strong showings are made with respect to some of them.'" *Id.*

Taking into account the allegations in the complaint as well as the evidence provided in support of the motion for default judgment, the Court concludes that Chanel has adequately stated a claim for relief pursuant to the above statute.

### 1. Trademark Ownership

First, in its complaint, Chanel specifically alleges that it is the owner of nine different trademarks (five of which consist of a CC monogram and four of which consist of the word Chanel). *See* Compl. ¶ 10. In its motion for default judgment, Chanel provides evidence to support this allegation, providing copies of nine trademark registrations. *See* Mot., Ex. D; *see also Brookfield Communs. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1047 (9th Cir. 1999) (stating that "plaintiff's registration of the mark on the Principal Register in the Patent and Trademark Office constitutes prima facie evidence of the validity of the registered mark and of [plaintiff's] exclusive right to use the mark on the goods and services specified in the registration.").

### 2. Copying

Second, in its complaint, Chanel has alleged that Ms. Tshimanga has promoted, distributed, sold, or offered for sale goods, including at least handbags and wallets, bearing marks that are exact copies of Chanel's protected marks and that she did so without Chanel's consent or authorization. *See* Compl. ¶¶ 19, 23. In its motion for default judgment and supplemental briefs, Chanel provides evidence demonstrating that it is more than likely that Ms. Tshimanga is the owner of the websites HandbagOutpost.com, DesignerOutpost.net, and HandbagsLuxery.com, *see* Part I.B.2, *supra*, and that goods bearing marks that are virtually identical to or substantially indistinguishable from the Chanel marks were sold on the websites. *See* Docket No. 25 (Pl.'s Supp. Br., Ex. B).[2]

### 3. Likelihood of Confusion

---

[2] Exhibit B establishes how *each* of the trademarks at issue was copied.

1    Finally, in its complaint, Chanel has alleged facts and, in its motion for default judgment,

2 provided evidence supporting a likelihood of confusion because of Ms. Tshimanga's use of the

3 marks.

4    First, the CC monogram and Chanel word marks appear to be strong, *i.e.* distinctive, marks.

5 Both the CC monogram and Chanel word marks are related to the personal name of Coco Chanel.

6 *See* Fed. R. Evid. 201 (providing that a court may take judicial notice of a fact not subject to

7 reasonable dispute, either because it is (1) generally known within the territorial jurisdiction of the

8 trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy

9 cannot reasonably be questioned). "While personal names used as trademarks are not inherently

10 distinctive, they are treated as strong marks upon a showing of secondary meaning. Secondary

11 meaning is the consumer's association of the mark with a particular source or sponsor." *E. & J.*

12 *Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291 (9th Cir. 1992).

13    Here, Chanel has alleged (and the Court must take the allegation as true in light of Ms.

14 Tshimanga's default) that the CC monogram and Chanel word marks have acquired secondary

15 meaning because Chanel has used the marks for an extended period of time; Chanel has expended

16 substantial time, money, and other sources to develop, advertise, and otherwise promote the marks

17 in association with the sale of, *e.g.*, handbags, wallets, and scarves; and the public has come to

18 identify merchandise bearing the marks as being high-quality goods sponsored and approved by

19 Chanel. *See* Compl. ¶¶ 11, 14-17; *see also Gallo*, 967 F.2d at 1291 (concluding that the district

20 court's finding that "the GALLO mark has acquired secondary meaning through the Winery's long,

21 continued use of the mark, the mark's widespread, national public recognition, and the Winery's

22 extensive and expensive advertising and promotion of products bearing the mark" was not clearly

23 erroneous).

24    Second, the marks used by Ms. Tshimanga appear to be virtually identical to or substantially

25 indistinguishable from Chanel's protected marks. *See* Docket No. 25 (Pl.'s Supp. Br., Ex. B)

26 (providing examples of goods sold by Ms. Tshimanga with marks at issue); *see also* Compl. ¶ 19

27 (alleging that the counterfeit products sold by Ms. Tshimanga bear marks that are exact copies of

28 Chanel's protected marks).

**United States District Court**
For the Northern District of California

1    Third, Ms. Tshimanga is using the marks on the same types of goods on which Chanel uses

2   its protected marks -- *e.g.*, handbags, wallets, and scarves. *See* Compl. ¶ 11 (alleging that the Chanel

3   marks are used on high quality handbags, wallets, and scarves); Docket No. 25 (Pl.'s Supp. Br., Ex.

4   B) (showing use of marks on handbags, wallets, and scarves).

5    Fourth, it is a fair inference that Ms. Tshimanga intended to infringe by trading off the

6   popularity of Chanel's preexisting marks. As noted above, Chanel has alleged that it has expended

7   substantial time, money, and other sources to develop, advertise, and otherwise promote the marks

8   and the public has come to associate the marks with high-quality goods sponsored and approved by

9   Chanel. *See* Compl. ¶¶ 11, 14-17. Thus, it is unlikely that Ms. Tshimanga was unaware of the

10   existence of Chanel's marks. Further, any claim of ignorance would be belied by the fact that Ms.

11   Tshimanga has used marks that appear to be exact copies of Chanel's marks and on goods of the

12   same type sold by Chanel. *See Joujou Designs, Inc. v. Jojo Ligne Int'l, Inc.*, 821 F. Supp. 1347,

13   1355 (N.D. Cal. 1992) (doubting the credibility of defendant's claim that he knew nothing of

14   plaintiff's mark since defendant was a participant in the same market for women's clothing and

15   plaintiff was well-established and had advertised extensively in the same California women's

16   clothing market; also noting that there was a strong inference that defendant not only knew of

17   plaintiff's mark, but also had the intent to infringe and trade off its popularity, because of the similar

18   appearance, placement, sound and feel of defendant's mark).

19    The Court acknowledges that not all of the *Sleekcraft* factors noted above weigh in favor of a

20   likelihood of confusion. For example, the goods sold by Ms. Tshimanga are expensive, and so a

21   buyer would generally be expected to exercise greater care before purchasing such a product. *See*

22   *Sleekcraft,* 599 F.2d at 353. Also, there is no evidence before the Court to indicate that Chanel and

23   Ms. Tshimanga use the same marketing channels (*e.g.*, the Internet). Even so, there is a sufficiently

24   strong showing with respect to the factors discussed above which does support a likelihood of

25   confusion.

26    Accordingly, the Court concludes that Chanel has adequately stated a claim for trademark

27   counterfeiting and infringement pursuant to § 1114(1)(a). Because Chanel has adequately stated a

28

United States District Court

For the Northern District of California

1  claim for relief, and because the remaining *Eitel* factors largely weigh in favor of Chanel, the Court

2  recommends that Chanel's motion for default judgment be granted.

3  C.    Injunctive Relief, Damages, and Attorney's Fees

4        Having concluded that a default judgment is appropriate in the instant case, the Court turns

5  to the issue of what constitutes proper relief.  In its motion, Chanel seeks as relief an injunction,

6  damages, attorney's fees, and costs.

7        1.    Injunctive Relief

8        Chanel seeks an injunction which would bar Ms. Tshimanga (as well as her agents,

9  representatives, servants, employees, and all those acting in concert or participation therewith) from

10 manufacturing or causing to be manufactured, importing, advertising or promoting, distributing,

11 selling or offering to sell products which bear marks that infringe the Chanel marks.

12       Under 15 U.S.C. § 1116(a), a court has the "power to grant injunctions according to

13 principles of equity and upon such terms as the court may deem reasonable, to prevent the violation

14 of any right" of the trademark owner.  15 U.S.C. § 1116(a).  "The Supreme Court recently reiterated

15 that [a court] should apply 'traditional equitable principles' in deciding whether to grant permanent

16 injunctive relief, and the decision is 'an act of equitable discretion by the district court, reviewable

17 on appeal for abuse of discretion.'"  *Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1137-38 (9th

18 Cir. 2006).

19       In the instant case, the traditional equitable principles weigh in favor of an injunction.  First,

20 as discussed above, there is sufficient evidence that Ms. Tshimanga has infringed the marks at issue

21 in the past.  Although there is no evidence of ongoing infringement, Chanel is not required to prove

22 such in order to obtain an injunction; indeed, it is not even required to produce evidence that Ms.

23 Tshimanga is likely to infringe again.  *See Levi Strauss & Co. v. Shilon*, 121 F.3d 1309, 1314 (9th

24 Cir. 1997).  That Ms. Tshimanga might infringe again in the future, however, is a possibility that

25 cannot be foreclosed.  Notably, after Chanel sent its cease-and-desist letter, Ms. Tshimanga

26 continued to infringe the marks at issue, setting up the website HandbagsLuxery.com.  Second, the

27 balance of hardships weighs in Chanel's favor.  Without an injunction, Ms. Tshimanga could start

28 her infringement anew, and the harm to Chanel is not insignificant since the inferior goods sold by

United States District Court

For the Northern District of California

1    Ms. Tshimanga could harm Chanel's reputation and goodwill.  *See* Mot., Ex. C (Hahn Sisbarro Decl.

2    ¶ 11).  In contrast, the burden of an injunction on Ms. Tshimanga is minimal.  *See id.* (noting that if

3    the defendant sincerely intends not to infringe, then an injunction is of little harm).

4         Accordingly, the Court recommends that an injunction in favor of Chanel be issued.  An

5    injunction broad in scope is reasonable given that Ms. Tshimanga has used the marks to sell the

6    same type of goods as Chanel.  *See Perfumebay.com Inc. v. eBay Inc.*, 506 F.3d 1165, 1177 (9th Cir.

7    2007) ("'When the infringing use is for a similar service, a broad injunction is especially

8    appropriate.'").

9         2.    <u>Damages</u>

10        Chanel also seeks an award of damages for the trademark counterfeiting and infringement by

11   Ms. Tshimanga.

12        Title 15 U.S.C. § 1117 covers damages for violations of the Lanham Act.  Under subsection

13   (a), for "a violation of any right of the registrant of a mark registered in the Patent and Trademark

14   Office, . . . the plaintiff shall be entitled, subject to the provisions of sections 29 and 32 [15 U.S.C.

15   §§ 1111, 1114], and subject to the principles of equity, to recover (1) defendant's profits, (2) any

16   damages sustained by the plaintiff, and (3) the costs of the action."  15 U.S.C. § 1117(a).

17        Subsection (b) contains a special provision for damages when a counterfeit mark is involved.

18   Counterfeit mark, as defined in 15 U.S.C. § 1116(d), means "a counterfeit of a mark that is

19   registered on the principal register in the United States Patent and Trademark Office for such goods

20   or services sold, offered for sale, or distributed and that is in use, whether or not the person against

21   whom relief is sought knew such mark was so registered."  *Id.* § 1116(d)(1)(B)(i).  "Counterfeit" is

22   defined in 15 U.S.C. § 1127 as "a spurious mark which is identical with, or substantially

23   indistinguishable from, a registered mark."  *Id.* § 1127.  Under subsection (b),

24        [i]n assessing damages under subsection (a), the court shall, unless the
         court finds extenuating circumstances, enter judgment for three times
25        such profits or damages, whichever is greater, together with a
         reasonable attorney's fee, in the case of any violation of section
26        32(1)(a) of this Act (15 U.S.C. 1114(1)(a)) . . . that consists of
         intentionally using a mark or designation, knowing such mark or
27        designation is a counterfeit mark . . . in connection with the sale,
         offering for sale, or distribution of goods or services.

28

1  *Id.* § 1117(b).

2      Finally, subsection (c) of § 1117 allows for an award of statutory damages when a counterfeit

3  mark is involved.  It provides that,

> [i]n a case involving the use of a counterfeit mark . . . in connection
> with the sale, offering for sale, or distribution of goods or services, the
> plaintiff may elect, at any time before final judgment is rendered by
> the trial court, to recover, instead of actual damages and profits under
> subsection (a), an award of statutory damages for any such use in
> connection with the sale, offering for sale, or distribution of goods or
> services in the amount of --
>
> (1)    not less than $ 500 or more than $ 100,000 per counterfeit
>        mark per type of goods or services sold, offered for sale, or
>        distributed, as the court considers just; or
>
> (2)    if the court finds that the use of the counterfeit mark was
>        willful, not more than $ 1,000,000 per counterfeit mark per
>        type of goods or services sold, offered for sale, or distributed,
>        as the court considers just.

13  *Id.* § 1117(c).

14      In the instant case, Chanel has asked for an award of statutory damages pursuant to §

15  1117(c), more specifically, an award of $678,918.18.  *See* Mot. at 16.  In its motion and first

16  supplemental brief, Chanel demonstrates how it arrived at this calculation.  For each website -- *i.e.*,

17  HandbagOutpost.com, DesignerOutpost.net, and HandbagsLuxery.com -- Chanel has printouts

18  which shows the counterfeit goods that were being sold on a particular date.  For

19  HandbagOutpost.com, Chanel has printouts for three different dates (May 2006, October 2006, and

20  April 2007).  For DesignerOutpost.net and HandbagsLuxery.com, Chanel has printouts for only one

21  date each (July 2006 and January 2007, respectively).  *See* Docket No. 25 (Pl.'s Supp. Br., Ex. B).

22  For each website, Chanel added up the prices of the goods being advertised.  Some of the goods

23  were available in different colors; for those goods, Chanel assumed that one good in each color was

24  available.  For example, if a handbag, offered for sale for $399, was available in four different

25  colors, *see id.* (Pl.'s Supp. Br., Ex. B at 21), then Chanel assumed that four handbags were being

26  offered for sale, for a total of $1,596 (*i.e.*, $399 x 4 = $1,596).

27

28

United States District Court

For the Northern District of California

1    Applying this methodology, the Court determined that, for HandbagOutpost.com, for the

2 May 2006 date, 12 items were being offered for sale for a total of $3,255.98.[3]  For the October 2006

3 date, 28 items were being offered for sale for a total of $12,192.[4]  For the April 2007 date, 36 items

4 were being offered for sale for $30,864.[5]  The average of $3,255.98; $12,192; and $30,864 is

5 approximately **$15,437**.  *See* Mot. at 15 (arriving at an average of $15,427); Docket No. 25 (Pl.'s

6 Supp. Br. at 8 n.4).

7    For DesignerOutpost.net, the Court determined that 21 items were being offered for sale for a

8 total of $**9,279**.[6]  *See* Mot. at 15 (same).

9    For HandbagsLuxery.com, the Court determined that 59 items were being offered for sale for

10 a total of **$39,085**.[7]  *See* Mot. at 16 (calculating $37,986).

11    The Court's calculations were largely the same as Chanel's calculations.

12    Chanel then assumed that the total for each website represented the value of Ms.

13 Tshimanga's inventory during any given sale period and further assumed that, for each website, Ms.

14 Tshimanga turned her inventory every eight weeks.  Chanel made the latter assumption because

15 Chanel introduces new collections of its genuine branded products six times per year, or

16 approximately every eight weeks, *see* Docket No. 25 (Pl.'s Supp. Br., Ex. C) (Hahn Sisbarro Decl. ¶

17 5) and because -- although Chanel cites no authority in support -- "the counterfeiting market

18 attempts to mirror the genuine market in so many other ways."  *Id.* (Pl.'s Supp. Br. at 6).  Chanel

19 also assumed that, for each website, the infringing period was from the date that the website was

20 created until the date that Ms. Tshimanga was served with the summons and complaint in this case

21 _____

22    [3] $339 + $349 + $349 +109 +$399 + $369 + $269 + $299 + $319 + $429 + $12.99 + $12.99 = $3,255.98.

23    [4] ($399 x 4) + ($399 x 3) + ($399 x 4) + $399 + ($359 x 2) + $399 + $499 + $499 + ($499 x 7)

24 + ($399 x 2) + ($499 x 2) = $12,192.

25    [5] $1,599 + ($799 x 2) + ($999 x 4) + ($199 x 8) + $1,399 + ($599 x 3) + $1,399 + $1,399 + $1,599 + $1,599 + $899 + ($899 x 8) + $1,399 + $799 + $1,399 + $1,199 = $30,864.

26    [6] $499 + $399 + $399 + $399 + $399 + $399 + $399 + $399 + $399 + $399 + $399 + $399 + 

27 $399 + $499 + $499 + $499 + $499 + $499 + $499 + $499 + $499 = $9,279.

28    [7] ($599 x 4) + ($799 x 3) + ($699 x 2) + ($699 x 4) + ($699 x 6) + ($899 x 9) + ($699 x 4) + ($659 x 4) + ($699 x 4) + ($599 x 3) + ($599 x 5) + ($599 x 4) + ($799 x 3) + ($699 x 4) = $39,085.

**United States District Court**
For the Northern District of California

1    (*i.e.*, October 27, 2007).  Finally, Chanel assumed that Ms. Tshimanga made a 50% profit during the

2    infringing period.

3         With these assumptions, Chanel calculated that Ms. Tshimanga may have earned at least

4    $77,135 in profits through HandbagOutpost.com; $42,335.44 in profits through

5    DesignerOutpost.com; and $106,835.62 in profits through HandbagsLuxery.com.  Chanel then

6    argued that these amounts should be trebled because an award of profits pursuant to 15 U.S.C. §

7    1117(a) is subject to mandatory trebling pursuant to § 1117(b) when a counterfeit mark is involved.

8    Thus, Chanel arrived at the final figure of $678,918.18.  According to Chanel, this amount "equates

9    to $25,145.12 per registered mark counterfeited (9) per type of good (3)."  Mot. at 16.

10         As a preliminary matter, the Court agrees with Chanel that statutory damages may be

11    awarded pursuant to § 1117(c) because counterfeit marks are at issue in the instant case.  There is no

12    real dispute that the marks used by Ms. Tshimanga on the three websites were either identical to or

13    substantially indistinguishable from Chanel's protected marks.  That being said, the Court does not

14    endorse Chanel's approach as to determining the appropriate amount of statutory damages.

15         Section 1117(c) does not give any specific guidance as to how a court should determine an

16    appropriate statutory damages award.  However,

17         many courts have considered the following factors for the award of
18    statutory damages under an analogous [statutory damages] provision
     of the Copyright Act: (1) "the expenses saved and the profits reaped;
     (2) the revenues lost by the plaintiff; (3) the value of the copyright; (4)
19    the deterrent effect on others besides the defendant; (5) whether the
     defendant's conduct was innocent or willful; (6) whether a defendant
20    has cooperated in providing particular records from which to assess
     the value of the infringing material produced; and (7) the potential for
21    discouraging the defendant."

22    *Cartier v. Symbolix Inc.*, 544 F. Supp. 2d 316, 318 (S.D.N.Y. 2008).

23         The Court agrees that it is reasonable to get guidance from copyright law in determining the

24    proper amount of statutory damages under the Lanham Act.  However, it should be noted that the

25    statutory damages provision in the Lanham Act is somewhat different from the statutory damages

26    provision in the Copyright Act.  The Copyright Act provides for "an award of statutory damages for

27    all infringements involved in the action, with respect to any one work."  17 U.S.C. § 504(c)(1).  The

28    Lanham Act provides for "an award of statutory damages . . . per counterfeit mark per type of goods

United States District Court

For the Northern District of California

1  or services sold." 15 U.S.C. § 1117(c). According to one learned treatise, the phrase "per

2  counterfeit mark per type of goods or services sold"

> probably means that the statutory award cannot be multiplied by the
> number of counterfeit items sold or offered for sale. Under the
> Copyright Act, only single statutory limits are applicable for each
> copyrighted work infringed, regardless of how many times a defendant
> has infringed or how many copies the infringer has produced. Under
> the Copyright Act, one does not multiply the minimum and maximum
> limits by the number of infringing copies. For infringement of a single
> copyrighted work by a single infringer, the statutory ceiling and floor
> dollar limits apply, no matter how many acts of infringement are
> involved in the lawsuit, and regardless of whether the acts were
> separate, isolated, or occurred in a related series. The Copyright Act
> ceiling and floor dollar limitations are multiplied if separate works or
> separately liable infringers are involved in one lawsuit.

10  McCarthy on Trademarks and Unfair Competition § 30:95 (4th ed.). The Court agrees that the

11  phrase "per counterfeit mark" does suggest that, as in copyright law, the number of infringing copies

12  is not important; the number of protected marks violated is more important. That being said, the

13  phrase says in its entirety "per counterfeit mark per type of goods or services sold," which suggests

14  that, while a court should not consider the number of counterfeit items actually sold or offered of

15  sale, it should consider the number of *type* of goods or services sold or offered for sale.

16       According to Chanel, the phrase "per counterfeit mark per type of goods or services sold" as

17  applied in the instant case means 9 protected marks multiplied by 3 types of goods (*i.e.*, handbags,

18  wallets, and scarves). *See* Mot. at 16. This is an overly simplistic approach. The Court cannot

19  assume that each of Chanel's marks is infringed by a handbag, wallet, and scarf sold or offered for

20  sale by Ms. Tshimanga. Rather, the Court must look at each trademark and determine how many

21  goods infringe that mark. *See, e.g.*, *WHG TM Corp. v. Patel*, No. 5:07 CV 3087, 2008 U.S. Dist.

22  LEXIS 13282, at *3 (N.D. Ohio Feb. 22, 2008). Also, even though Chanel does have nine

23  trademarks, the Court must take into account that all of the CC monogram marks are very similar

24  and all of the Chanel word marks are very similar. "If there are multiple marks involved, rather than

25  give plaintiff a windfall, courts tend to award an amount without multiplying it by the number of

26  marks or to lower the award given per mark." 2-5 Gilson on Trademarks § 5.19. *See, e.g.*, *Louis*

27  *Vuitton Malletier & Oakley, Inc. v. Veit*, 211 F. Supp. 2d 567, 584-85 (E.D. Pa. 2002) (noting that,

28

**United States District Court**
For the Northern District of California

1   "[i]n similar cases concerning multiple marks, courts have been inclined to either award the

2   maximum without multiplication or to lower the per mark award").

3        Taking into account the above, the Court shall proceed with its analysis of statutory

4   damages, looking to the factors which are commonly considered in copyright law -- *i.e.*, (1) the

5   expenses saved and the profits reaped; (2) the revenues lost by the plaintiff; (3) the value of the

6   intellectual property; (4) the deterrent effect on others besides the defendant; (5) whether the

7   defendant's conduct was innocent or willful; (6) whether a defendant has cooperated in providing

8   particular records from which to assess the value of the infringing material produced; and (7) the

9   potential for discouraging the defendant.

10       (1)    *The expenses saved and profits reaped.*  There is no evidence of record as to the

11  expenses that Ms. Tshimanga saved or might have saved as a result of her infringement.  However,

12  Chanel has provided, as detailed above, what it believes to be a fair estimate of Ms. Tshimanga's

13  profits.  While the Court understands that Chanel's ability to estimate profits is burdened by Ms.

14  Tshimanga's failure to appear, and while Chanel has demonstrated that it has made at least some

15  effort to limit its request for statutory damages (*e.g.*, estimating that Ms. Tshimanga made only a

16  50% profit even though the Lanham Act puts the burden on the defendant to show its costs, *see* 15

17  U.S.C. § 1117(a)), the Court is not persuaded that Chanel's estimate of profits is a fair one.  In

18  particular, the Court is troubled by Chanel's assumption that Ms. Tshimanga turned her inventory

19  every eight weeks.

20       As noted above, Chanel made this assumption because Chanel introduces new collections of

21  its genuine branded products six times per year, or approximately every eight weeks, *see* Docket No.

22  25 (Pl.'s Supp. Br., Ex. C) (Hahn Sisbarro Decl. ¶ 5) and because "the counterfeiting market

23  attempts to mirror the genuine market in so many other ways."  *Id.* (Pl.'s Supp. Br. at 6).  Chanel,

24  however, provides no authority to support the latter proposition.  And even if that proposition were

25  true, it does not seem appropriate to assume that Ms. Tshimanga's counterfeiting actions specifically

26  mimic the larger counterfeiting market, at least in the absence of any evidence to the contrary.  In

27  fact, what evidence Chanel has offered suggests that Ms. Tshimanga may have had a turn over much

28  longer than eight weeks.  For example, for the HandbagOutpost.com website, Chanel provided

**United States District Court**

For the Northern District of California

1    evidence as to infringing goods sold or offered for sale in May 2006, October 2006, and April 2007.

2    This suggests a turnover period of at least six months to a year.  For the websites

3    DesignerOutpost.net and HandbagsLuxery.com, Chanel provided evidence as to infringing goods

4    sold or offered for sale on one date only.

5          (2)    *The revenues lost.*  Chanel has not provided any evidence as to revenues lost, either as

6    a result of Ms. Tshimanga's activity or as a result of counterfeiting in general.  Although the former

7    might be difficult to provide, the latter is information, if it exists, that likely is within the possession,

8    custody, or control of Chanel.  Furthermore, the Court notes that, arguably, revenues lost with

9    respect to Ms. Tshimanga specifically might not be substantial since, as noted above, the goods sold

10    by Ms. Tshimanga are presumably less expensive than the authentic Chanel merchandise and that

11    Internet shoppers who buy from Ms. Tshimanga are not highly likely to purchase authentic Chanel

12    products.  Absent some evidentiary showing, the Court cannot reach any conclusion about the

13    magnitude of lost revenues to Chanel.

14          (3)    *The value of the intellectual property*.  For the reasons discussed above, the Chanel

15    marks are strong, *i.e.*, distinctive, marks, and therefore their value is significant.

16          (4)    *The deterrent effect on others besides the defendant*.  A significant award against Ms.

17    Tshimanga would clearly have some kind of deterrent effect on other infringers.

18          (5)    *Whether the defendant's conduct was innocent or willful.*  For the reasons discussed

19    above, it is likely that the infringement by Ms. Tshimanga was willful and not innocent.

20          (6)    *Whether the defendant has cooperated in providing records.*  This factor is not plainly

21    applicable since Ms. Tshimanga has not appeared in the lawsuit.  However, by refusing to respond to

22    the cease and desist letter and answering the lawsuit, Ms. Tshimanga has not cooperated in a general

23    sense.

24          (7)    *The potential for discouraging the defendant.*  As Ms. Tshimanga is an individual, it is

25    likely that she can be deterred by a damages award of a smaller scale.

26          Taking into account all of the above, the Court recommends that Chanel be awarded

27    statutory damages in the amount of $450,000 for Ms. Tshimanga's infringement of Chanel's

28    protected marks.  In arriving at this figure, the Court has taken into consideration the fact that the

United States District Court

For the Northern District of California

CC monogram marks are largely identical or at least substantially similar[8] and that the Chanel word marks are also largely identical. It would amount to a windfall to Chanel to treat the nine marks as entirely distinct and separate. *See* 2-5 Gilson on Trademarks § 5.19 (" If there are multiple marks involved, rather than give plaintiff a windfall, courts tend to award an amount without multiplying it by the number of marks or to lower the award given per mark."). The Court has therefore treated the nine marks, for purposes of calculating statutory damages, as two marks (CC monogram and Chanel word) and, as there are three types of merchandise (*i.e.*, handbags, wallets, and scarves), there is a total of six violations. The Court recommends imposing $75,000 per violation for a total of $450,000. A larger award is not appropriate given that Chanel has not provided any evidence to show that it has lost revenues as a result of Ms. Tshimanga's conduct and an award of this size will adequately serve to deter Ms. Tshimanga, an individual. On the other hand, a smaller award is not appropriate in light of the value of the CC monogram and Chanel word marks and Ms. Tshimanga's willful infringement.

### 3. Attorney's Fees

In addition to an injunction and statutory damages, Chanel seeks its attorney's fees. According to Chanel, it is entitled to its fees pursuant to 15 U.S.C. § 1117(a), which provides that a "court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). Under § 1117(a), a trademark case may be "exceptional" and may merit attorney's fees where the defendant's infringement is "malicious, fraudulent, deliberate, or willful." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1409 (9th Cir. 1993). *See, e.g.*, *Earthquake Sound Corp. v. Bumper Indus.*, 352 F.3d 1210, 1217-19 (9th Cir. 2003) (holding that "total picture in the case was one of deliberate, willful infringement" where the defendant knew of the plaintiff's mark for three years before applying for its own mark's registration; the plaintiff had provided ample evidence of actual confusion; the defendant did not establish that it took reasonable measures, such as consulting an attorney, when informed by the plaintiff of possible infringement; and the defendant, though

---

[8] The Court acknowledges that the three-quarter CC monogram and the CC monogram in a box are somewhat different from the other CC monogram marks, but the similarities (*i.e.*, the interlocking C's) outweigh the differences (*i.e.*, the three-quarter representation or the box).

1    continually notified of the problem by the plaintiff, refused the plaintiff's offer to settle the matter

2    without litigation and instead continued to market the infringing products).

3          Although, as indicated above, the Court believes that Ms. Tshimanga's conduct was willful

4    in the instant case, the Ninth Circuit does not appear to have expressly held that a prevailing plaintiff

5    may be awarded fees pursuant to § 1117(a) when it has elected statutory damages under § 1117(c).[9]

6    Some courts have questioned whether fees are available when there is such an election, *see, e.g.*,

7    *Rolex Watch U.S.A., Inc. v. Brown*, No. 01 Civ. 9155 (JGK) (AJP), 2002 U.S. Dist. LEXIS 10054, at

8    *10-11 (S.D.N.Y. 2002) (acknowledging uncertainty on the issue; stating that "[p]erhaps Congress

9    intended § 1117(c) to replace only the damages available under § 1117(a) while leaving available

10   the 'exceptional case' attorneys' fee provision of § 1117(a)" or that "perhaps because of the

11   enhanced amount of statutory damages under § 1117(c) or a legislative oversight, attorneys' fees are

12   not available where statutory damages are awarded under § 1117(c)"); other courts, however, have

13   concluded that a prevailing plaintiff may be awarded both statutory damages under § 1117(c) and

14   attorney's fees under § 1117(a). *See, e.g.*, *Microsoft Corp. v. E&M Internet Bookstore, Inc.*, No. C

15   06-06707 WHA, 2008 U.S. Dist. LEXIS 4381, at *10 (N.D. Cal. Jan. 22, 2008).

16         Fortunately, this Court need not address the legal issue of whether attorney's fees are

17   available pursuant to § 1117(a) when a prevailing plaintiff elects statutory damages under § 1117(c).

18   The fees sought by Chanel are modest, totaling $19,051.43. *See* Mot., Ex. A (Keller Decl. ¶¶ 9-11)

19   (stating that he billed 32.90 hours at an hourly rate of $500 but that his firm charged Chanel only

20   $11,770 because some hours were discounted as a professional courtesy); *id.*, Ex. L (Gaffigan Decl.

21   ¶ 4) (stating that he billed 13.50 hours at an hourly rate of $350); *id.*, Ex. E (Robert Holmes Decl. ¶

22   16) (stating that he charged $2,556.43).  These fees could be appropriately awarded as part of an

23   award of statutory damages. *See, e.g.*, *Cartier v. Symbolix Inc.*, 544 F. Supp. 2d 316, 320 (S.D.N.Y.

24   2008) ("find[ing] it unnecessary to resolve this interesting question of statutory interpretation"

25

26         [9] The Ninth Circuit has held, however, that if a plaintiff elects to recover statutory damages
27   under § 1117(c), it cannot be awarded fees pursuant to § 1117(b). *See K & N Eng'g, Inc. v. Bulat*, 510
     F.3d 1079, 1082 (9th Cir. 2007) ("In this case, K&N elected to recover statutory damages under §
     1117(c). Because of K&N's election, the court did not assess or award K&N actual damages or profits
28   under § 1117(a).  Therefore, there is no statutory basis to award K&N attorney's fees under § 1117(b).").

United States District Court

For the Northern District of California

1   because "a modest award of fees reflecting the modest amount of trebled profits is appropriate either

2   as a separate award, or as a part of an award of statutory damages"); *Rodgers v. Anderson*, No. 04

3   Civ. 1149 (RJH) (AJP), 2005 U.S. Dist. LEXIS 7054, at *12 (S.D.N.Y. Apr. 26, 2005) ("find[ing]

4   that the award of enhanced statutory damages of $ 250,000 under § 1117(c) more than suffices in

5   this case to make plaintiff Rodgers whole, including for the $ 15,697.35 claimed for attorneys' fees

6   and disbursements and serves as a sufficient deterrent to these defendants and others.").

7          Accordingly, the Court recommends that Chanel be awarded the fees sought.

8          4.       Costs

9          The Court notes that Chanel seeks not only attorney's fees but also costs pursuant to 15

10  U.S.C. § 1117(a).  The costs requested total $500, representing the filing fee ($350) and the fee for

11  service of process ($150).  The Court recommends that these costs be awarded but pursuant to 28

12  U.S.C. § 1920 and Civil Local Rule 54-3(a).

13                         **III.    RECOMMENDATION**

14         For the foregoing reasons, the Court recommends that Chanel's motion for default judgment

15  be granted and that Chanel be awarded a total of $469,551.43, representing statutory damages,

16  attorney's fees, and costs.  The Court further recommends that Ms. Tshimanga (as well as her

17  agents, representatives, servants, employees, and all those acting in concert or participation

18  therewith) be enjoined from manufacturing or causing to be manufactured, importing, advertising or

19  promoting, distributing, selling or offering to sell products which bear marks that infringe the

20  Chanel marks.

21         Any party may file objections to this report and recommendation with the district judge

22  within ten days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b);

23  Civil L.R. 72-3.

24

25  Dated:  July 15, 2008

26                                              _____

27                                              EDWARD M. CHEN
                                                United States Magistrate Judge

28

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28